# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
September 25, 2001 Session

## STATE OF TENNESSEE v. ANDERSON TOLIVER

**Direct Appeal from the Criminal Court for Hamilton County**
**Nos. 223083, 223085     Stephen M. Bevil, Judge**

---

**No. E2001-00584-CCA-R3-CD**
**December 18, 2001**

---

The defendant was convicted in two indictments of aggravated child abuse and sentenced to concurrent nine-year sentences. He timely appealed, arguing that the evidence was insufficient, that the trial court erred in consolidating the indictments, in permitting evidence as to other similar offenses, and in not properly instructing the jury as to various matters, including lesser-included offenses. We conclude that any errors in this regard were harmless. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOE G. RILEY, J., joined. JOSEPH M. TIPTON, J., filed a concurring opinion.

Jerry H. Summers (on appeal) and Jerry S. Sloan (at trial), Chattanooga, Tennessee, for the appellant, Anderson Toliver.

Paul G. Summers, Attorney General and Reporter; Angele Michele Gregory, Assistant Attorney General; William H. Cox, III, District Attorney General; and Kelli Black, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

In his appeal, the defendant, Anderson Toliver, presents the following issues:

> I. The evidence presented was insufficient to support the convictions.
>
> II. The verdicts were contrary to the weight of the evidence, and the court, sitting as the thirteenth juror, should set them aside.
>
> III. The trial court erred in consolidating the indictments.

IV.   The trial court erred in allowing testimony as to prior beatings of the victim by the defendant.

V.    The trial court gave insufficient cautionary instructions as to the prior beating[s].

VI.   The references by the prosecutor to prior beatings by the defendant violated his rights to due process and to a fair trial.

VII.  The evidence was insufficient to show that the extension cord used in the beatings was a "deadly weapon."

VIII. The evidence as to the March 1, 1998, incident was insufficient to constitute aggravated child abuse.

IX.   The trial court erred in not instructing the jury as to self-defense.

X.    The trial court erred in not instructing the jury as to the weight to be given character evidence.

XI.   The trial court erred in giving preliminary jury instructions which were not repeated at the conclusion of the trial.

XII.  The trial court erred in not instructing the jury as to criminal attempt aggravated child abuse.

XIII. The trial court erred in not instructing the jury as to criminal attempt child abuse.

XIV.  The trial court erred in not instructing the jury as to the lesser-included offense of assault.

## BACKGROUND

There were two defendants at the trial, the defendant on appeal, Anderson Toliver, the stepfather of the victim, and Annie Toliver, his wife and the victim's natural mother. She was convicted of a lesser offense and did not appeal. Therefore, the references in this opinion to the "defendant" are to Anderson Toliver.

In her opening statement, the prosecutor began almost immediately describing a pattern of abuse of the victim by the defendant:

2

MS. BLACK:  "They won't do anything to you if you report it, because I was a cop in Louisiana."  Those were the words that Gregory heard over the one and a half years that he was being beaten and whipped by his stepfather.

It started when he was in [the] eighth grade, usually occurred every time he got a report card or a progress report, approximately every six to nine weeks.  It started with a phone cord.  His stepdad would wear a weight belt on his hand with the fingertips missing as he would beat Gregory and his younger brother.

From the phone cord it went to an extension cord, to an extension cord with coat hangers in it, three coat hangers secured with duct tape with an extension cord braided around it.  He'd tell Gregory to, "Bend over.  Put your hands out and bend over.  Empty your pockets and stand there until I'm done."  The whippings left bruises, the whippings left whelps.

THE COURT:  Ms. Black, I'm sorry to interrupt.

If there's any witness in the courtroom or anyone who thinks they may be called as a witness in this case, you'll need to step outside the courtroom and remain outside the courtroom until your name is called.

You may proceed.

MS. BLACK:  The whippings left bruises and whelps.  The beatings were so severe that the children would take coats to school with them for a week at a time so they had a cushion to sit on because their bottoms hurt so bad.  It escalated to the point where finally, when the victim knew, Gregory Smith knew, the report card was coming out that week, he ran away from home.  He went to live with his grandmother.

No objection was made by trial defense counsel[1] to these statements.

The victim, Gregory DeWayne Smith, who was 18 years old and a senior in high school at the time of the trial, testified, as the State's first witness, that the defendant would spank him and his

---

[1]The defendant is represented by different counsel on appeal.

younger brother with a weight belt when either received a school grade lower than a "B."[2]  Before being asked about either of the incidents alleged in the indictments, the victim was questioned about earlier spankings:

> Q.     Okay.  About what time do you remember the first discipline that you got from your stepfather?
>
> A.     It was towards the end of my eighth grade year.
>
> Q.     And how did that start?
>
> A.     The discipline or the reason?
>
> Q.     Yeah.
>
> A.     The reason was probably because of grades, and normally he spanked us with a weight belt, me and my little brother.
>
> Q.     Okay.  When you say because of grades, what kind of grades are you talking about?
>
> A.     Anything below a "B".
>
> Q.     And where would he spank you?
>
> A.     He would tell us to bend over and sometimes he would hit us on the back or the butt.
>
> Q.     On the back or on the bottom?
>
> A.     Uh-huh.
>
> Q.     Where would you be at when you would get these spankings?
>
> A.     In our room.
>
> Q.     Okay.  Would you have your clothes on our [sic] off?

---

[2]Because the defendant has presented as issues on appeal that the trial court erred in consolidating the offenses for trial, in allowing proof of other offenses, and that the proof was insufficient as to certain elements, we have set out, both chronologically and in detail, argument and testimony relevant to these claims.

A.    We'd have our clothes on, but sometimes we'd have to pull our pants down and have our underwear on.

Q.    Did you receive any pain?

A.    Yes.

Q.    How long would the pain last?

A.    Sometimes weeks, sometimes days.

Q.    What would you do for the pain?

A.    Ignore it.

Q.    Where would you hurt?

MR. SLOAN:   Your Honor, again, could we approach the bench?

THE COURT:  All right.

(Thereupon, a bench conference was had outside hearing of jurors and reporter.)

THE COURT:  Objection overruled.

Members of the jury, I am going to give you a contemporaneous instruction at this time.  The defendant, Mr. Toliver, is charged with the offense on two different dates, that is, March the 1st and April the 9th.  Mrs. Toliver is charged with the offense on April the 9th.

I'm allowing the testimony to be presented to the jury at this time about prior incidents.  Now, I'm not allowing this testimony to show that either Mr. Toliver or Mrs. Toliver has a propensity to commit this type of conduct or habitually committed this type of conduct, I'm only allowing this evidence in – and you're not to find out whether or not Mr. Toliver or Mrs. Annie committed these offenses on any other days.  I'm only allowing this evidence in because the defense in this case is that this was not an intentional, knowing act on this particular day, that there was no intent to commit the crime of aggravated child abuse, that it was an accident.

5

> So I'm only allowing this prior testimony in by the state going toward that issue on those two dates, March the 1st and April the 9th as to Mr. Toliver, and April the 9th as to Mrs. Toliver, whether or not on those two dates they committed this crime of aggravated child abuse. And you're only to consider this testimony about prior incidents as going toward those two specific dates.

No objection was made by defense counsel to the adequacy of this instruction.

The victim then was asked about the incident of March 1, 1998,[3] which was the basis for the first indictment, against only Anderson Toliver, and charging aggravated child abuse. He said that he had just received "some low grades" and described what happened when he returned home:

> A. It always started as like I would have to bend over and then he hit me with the extension cord, and this time it had coat hangers braided around it and then the extension cord and duct tape at the end. And I would fall, and if I fell, he'd hit me on my back until I had to get up.
>
> Q. What did it feel like when he was hitting you with the extension cord?
>
> A. At first it was like – the first contact it would be like a real pain, numbness, and then increase. Like at first I couldn't feel anything and then it was just like all coming in together and it hurt real bad.

The victim then described, in much greater detail, the April 9, 1998, incident,[4] saying that while he was in his room, the defendant hit him twice with the braided extension cord, without the added coat hangers and duct tape. When the victim then stood up and refused to bend over again, and the defendant grabbed his neck and tried unsuccessfully to force him to bend over. The defendant then began punching and choking the victim with his hands, handed the braided extension cord to the victim's mother, and began choking the victim again:

> A. Like my legs were kind of getting weak and I was kind of crouching over, then like after the second time he choked me with his hands, he would stop again and he would say something. I couldn't really hear what he was saying, because I was kind of – I wasn't losing consciousness, but I wasn't listening because I was getting choked. Then like he would stop one minute and then he told me

---

[3]The victim's testimony on direct examination as to the March 1 incident consists of two pages in the trial transcript, while his detailing of the April 9 incident consists of approximately nineteen pages.

[4]The indictment for this incident charged both defendants with aggravated child abuse.

6

again, when I was still kind of crouched over, which is the third time he choked me with his hands, and I ended up on the ground.

Q. Okay. Was he wearing anything on his hands when he would choke you?

A. He had kind of like a weight glove or a bike glove.

Q. Okay. What kind of pain were you in?

A. Lots of pain, because where he hit me on my back, where he was choking me. My neck was hurting and my throat was hurting real bad.

Q. Was he saying anything to you while he was choking you?

A. Yeah, he said that I couldn't take a beating from a real man, and stuff like he could kill me and stuff like that.

Q. Would you say anything back to him?

A. I couldn't.

The victim said that after the defendant had choked him three times, and he was on the floor, the defendant then retrieved the braided cord from the victim's mother and wrapped it around his neck:

Q. So you grabbed the extension cord when he swung at you and what did he do next?

A. He like wrapped it around my neck. I'm on the ground and he's like standing behind me wrapping the cord around my neck right here and he's holding it from behind.

Q. Is he saying anything to you at that time?

A. I don't know.

Q. What does he do when he gets it around your neck?

A. He kind of lifts me up off the ground and starts slinging me around the room.

7

Q. Can you show me with you [sic] hands, if you can, how he was slinging you around the room with it?

A. Well, like he was behind me and he had the cord like wrapped around my neck and he'd do like this, and I hit the bike sometime with my ribs.

Q. You hit what?

A. I hit the bicycles. We had some bikes down at the foot of our bed and like the bed was to his back and I was in front of him and he swung me around and I hit the bikes. He slung me back around and I hit the bed.

Q. Do you know what you hit the bikes – you said you hit the bikes with your ribs?

A. Hit the handle bars.

Q. And you said you hit the bed. What part of your body made contact with the bed?

A. Well, we had a bunk bed, so it was kind of tall, it came about right here on me, so it was all this part of my body, like my chest, and it was made out of wood.

Q. Is he saying anything to you while he's slinging you around the room?

A. I don't know.

Q. What happened after he got done slinging you around the room?

A. I started falling because I couldn't breathe and that's when I really lost consciousness like for a couple of seconds, because I just saw black. Then I was on the ground and I came back in. Like while I was going out, I heard my mom call his name. All she said was, "Anderson," and then like a few seconds after that, I kind of went out and then I came back and I guess he had let go. But I was on the ground.

Q. So when you came back to, was he in the room?

8

A. Yes, he was still behind me.

Q. Did he say anything to you at that time?

A. He told me something like he'd be right back, don't move.

Q. What did you do at that point in time?

A. I sat there for a minute and caught my breath and I got up and left.

Q. Where did you go?

A. I went upstairs to my neighbor's house.

Q. What happened when you got to your neighbor's?

A. I called the police.

Q. How were you feeling at that point in time?

A. I wasn't really feeling any pain, I guess it was trembling. I was just crying. I remember crying a lot. And then when the police got there, that's when it started hurting, like I noticed I had a real bad scar on my eye, real bad. I don't know how it got there, I just know my eye was like a cherry. And my throat was hurting real bad. I had like scratch marks on my neck, things like that. My ribs were hurting, because I hurt my ribs before playing football. I hit the same rib that I had hurt when I hit the bicycles.

Later in the trial, after defense counsel had completed his cross-examination of the victim, there was the following colloquy:[5]

THE COURT: Mr. Sloan, before we break for lunch, I want to go ahead and let you put on the record your objection earlier. You had objected at the bench conference and, of course, it's hard to – the court reporter can't pick up conversations at the bench, that's why I like to limit the bench conferences. You did make an objection to the state's getting into any prior incidences of either whippings or

_____

[5]The trial court refers to an objection made by defense counsel during an earlier unrecorded bench conference, but it is unclear when this objection was made. In his appellate brief, the defendant asserts, apparently, that his objection as to testimony regarding prior whippings occurred just after the victim had testified about them.

beatings or whatever they may be called and I said I'll let you put your objections and state anything that you wanted to on the record.

I did overrule that and the reason for it is, of course, in light of the fact that – the defense theory is that this was an accident as far as the injuries were concerned, but other than that, it was just a routine whipping, so there was no intent whatsoever to have any child abuse. In light of that defense, I allowed the state – and overruled your objection to allow the state to bring up these prior incidences to show that absence of mistake or lack of intent. I think it's particularly important in the light of the fact that, as was testified to, that these incidences occurred at the time of the grading, when Mr. Smith would come home with his grades and that's what happened on these prior occasions. And I was relying on the authority of State versus Dubose, which dealt with a similar type issue and allowed prior incidences in. And, of course, that's why I gave the jury cautionary instruction. I want to make sure that – and, of course, the verdict form will reflect that they're to base their verdict solely on the incident that occurred on March 1 as to Mr. Toliver and April the 9th as to Mrs. Toliver and only on April 9th as to Mrs. Toliver.

Did you want to put anything else on, Mr. Sloan, at this time?

. . . .

MR. SLOAN: Your Honor, the only thing, as I indicated I wanted to put on the record, prior to the testimony of the first witness, we had objected to that witness going into, quote, "other instances" of, quote, "whippings" to allege abuse. I was concerned about the fact that, you know, we just had no way to defend against those other alleged incidences, if there, in fact, were any. There's no question my client administered corporal punishment on occasion, the question was whether it was excessive or not. And without being aware of what these, quote, "other instances" were, then certainly the defendant couldn't be in a position to defend himself against those other instances.[6]

---

[6]Although trial defense counsel asserts that "prior to the testimony of the first witness" he had objected to admission of proof of prior whippings, and neither the trial court nor the State responded to this claim, we are unable to locate such an objection in the record. It may be that counsel was characterizing his arguments against consolidation as arguments against allowing proof of prior whippings.

So that was our objection on the record regarding that. And the only other thing I guess I said, Judge, was had the state felt that this was significant evidence to get into, they certainly could have drafted an indictment to appropriately put the defense on notice of what that was so that we could talk to potential witnesses and defend ourself [sic] from it. But that was my objection, Your Honor.

THE COURT: All right. In response to that, also, as the proof unfolded, it showed that there weren't any specific incidences other than just talking about some general times when this happened in the past, and it would not have been anything that the defense was not aware of in the police reports by the statement that there were prior incidences of this nature.

The victim's twelve-year-old half brother, Joshua Newton, testified that he had been removed from his mother and the defendant's home and was living at the Tennessee Baptist Children's Home at the time of trial. He stated that the defendant had whipped him and the victim with a belt and with an extension cord which was wrapped around itself. He said that the defendant made them empty their pockets before the whippings to make sure they did not have any padding, and made them bend over and stretch out their hands. He said that the defendant had whipped him "hard" with the extension cord "like maybe three times," but that he "got smart" and "learned [his] lesson." When asked about the victim, Joshua said he did not think that the victim had learned his lesson "because he repeatedly got it."

Joshua further testified that the whippings hurt "pretty bad" for a few days. However, in his prior statement given to a detective at the Red Bank Police Department, Joshua said that "after being punished in this manner, the bruises and whelps lasted about three weeks" and that he "could not sit without a cushion of some sort for about four days." Joshua said that he did not consider the whippings the defendant gave him as a beating and that he believed he deserved the whippings.

When Joshua identified the extension cord admitted into evidence, he said that it looked the exact same way he remembered it and that he had never seen anything added to it. The prosecutor then asked Joshua to recite from his prior statement, wherein he said that the "extension cord was usually wrapped with three pieces of coat hanger, one on each end and one in the middle" and that the "pieces of coat hanger was [sic] then wrapped with duct tape."

Joshua testified that he was at home the night of April 9, 1998, but did not see the incident between the victim and the defendant although he heard them scuffling. Joshua said that he did go into the victim's room to get a knife from the victim because he "guess[ed]" that the victim was going to kill the defendant with it.

Officer Kim Cofer of the Red Bank Police Department testified that she responded to a runaway call from the victim's mother, Annie Toliver, on Saturday, April 4, 1998. Mrs. Toliver told

11

Officer Cofer that the victim had run away before and that she thought he was at his grandmother's house. Mrs. Toliver called Cofer the following Tuesday, April 7, 1998, and told her she had obtained an attachment through juvenile court for the victim as an unruly runaway. Officer Cofer then went to the victim's school and took him into custody. While en route to the juvenile detention unit, the victim told Cofer that he had run away because "he was tired of being beaten like a freegin [sic] slave." The victim told her that the defendant whipped him with an extension cord when he did not make good grades in school.

Officer Cofer further testified that the victim came to the police department on April 10, 1998, and gave his statement regarding the April 9, 1998, incident to her and Detective Kyle. The victim told her he had been beaten with a "braided cord," thrown against a wall, and that the defendant had punched him with his fist. She said that the victim had bruising on his right eye and marks on his neck. Cofer identified three photographs showing injuries to the victim's right eye and cheek area, throat, and neck area.

Officer Jonathan Chambers, who was employed by the Chattanooga Police Department at the time of his testimony, but had been with the Red Bank Police Department at the time of the investigation, testified that on April 9, 1998, he had responded to a domestic violence call at an apartment in the same building where the victim lived, and spoke with the victim at this apartment. He testified as to his meeting the victim:

> He was very upset, he was crying, he couldn't hardly speak to me. I tried to ask him what happened and all he could tell me was that his stepdad beat him. That's all he could tell me. I let him try to get calmed down for a minute and I barely got his name out of him. I asked him again and he continued to say, "My stepdad beat me," is all he'd say. I observed on him his right eye was very swollen and also was bleeding and he had three claw marks on his neck.

Officer Chambers then went to the Tolivers' apartment, where he spoke with the defendant:

> I had knocked on the door and the defendant, Mr. Toliver, his wife had answered the door, they were very calm. And I spoke with them about what happened, they knew why I was there and they knew what I was going to ask them about.
>
> Mr. Toliver, he was very calm, he seemed like – he seemed he was kind of upset about what had happened, but seems like he was kind of over – he was relaxed, he was able to talk to me about it. He told me that he works on the road, he's gone a lot, and that he had had problems with his son, he'd run away and had had some problems with his grades and that he told him when he come home today he was going to get a spanking, or a whipping is what he said, a

12

whipping. And he told me that he came home and told him to get ready for his whipping. He said he makes him empty his pockets. He said when he emptied his pockets he had a knife in his hand. I asked him, I said, how did he have it in his hand?

And he told me, "Just like this" (indicating).

I said, "Show me." And he showed me, he had his hands like that. I said, "Was it just laying [sic] there, did he come at you with it or anything like that?"

And he said, "No." When he said that, when he said no, he said, "I wished he would have." He made that statement.

. . . .

I then asked him, you know – when he said he took the knife out of his hand, he said he hit him one time with an extension cord, is the way he put it. I was thinking just a regular white cord is what I was thinking. I didn't realize what it actually was that he was using. I didn't even ask to see it. He told me that he hit him with it once and that the victim turned around and refused –

He said when he turned around, he grabbed him by the throat, around the throat, and pushed him against the wall, and that evidently in the struggle – he said he didn't really remember a lot of it, but he said in the struggle he must have hit his – the victim must have bumped his head on the dresser, that's where the eye bleeding come from.

I asked him, "When he turned around, did he have his fist balled up or did he take a swing at you?"

He said no, that he did not. He said[,] "I didn't give him the chance."

Officer Timothy Thompson, of the Red Bank Police Department, testified that he had also responded to the domestic violence call on April 9. He stayed with the victim while other officers spoke with the defendant and Mrs. Toliver. Later, he spoke with Mrs. Toliver, having returned to the Tolivers' apartment at the request of Detective Jim Kyle to retrieve the electrical cord:

She stated that the disciplinary actions took place upon the outcome of their report cards: If they got goods [sic] grades, there was no

13

problem; if they had a bad report card, they were punished. The actions taken was punishment with an extension cord that was entwined and then it was tied on both ends and in the middle with a piece of coat hanger and duct tape wrapped around each strands [sic] of the coat hanger. At which time, as the disciplining began, the victims were advised to bend over, at which time they were struck in the buttocks with this extension cord.

Detective Sergeant Jim Kyle of the Red Bank Police Department testified that he spoke with the defendant in the booking room of the police station on April 9, 1998. The defendant, who appeared to be "very calm, considering he had been arrested," told Kyle that he was disciplining the victim with an extension cord when the victim got injured. Regarding the manner of discipline, the defendant told Detective Kyle, "I have them bend over and stretch there [sic] arms out and tighten up their muscles and then I strike them in the buttocks area." The defendant also told Kyle, "That's legal, I have a right to do that."

The following day, April 10, 1998, Detective Kyle requested the victim and his grandmother to come to the police station to give statements. Photographs were made of the victim's injuries at that time, as well. Detective Kyle said that the victim was "fairly quiet, like someone had just been beat down, he was just very quiet and withdrawn."

On cross-examination, Detective Kyle said that after discussing the case with an assistant district attorney general on April 10, 1998, it was "very apparent" that the charge was more serious than simple assault with which the defendant was initially charged. Detective Kyle then drafted two new affidavits charging the defendant with aggravated child abuse. He testified that he personally filled out one affidavit; Detective Gary Wooten filled out the other affidavit in his presence, and he swore to both of the affidavits. Kyle said that he indicated in his affidavit that the extension cord was twisted together so as to make it a deadly weapon.

William Russell, testifying as a character witness for Mrs. Toliver, said that he had attended the same church as Mrs. Toliver prior to her marriage to the defendant. He had also sold a car to the Tolivers. Russell said that he felt like he knew the defendant "very well" and that the defendant's reputation in the community was "excellent." Russell also testified that he knew Mrs. Toliver's "children well enough to know that if they were being beat [sic], they would tell [him]."

Grace Hughley was also called by Annie Toliver as both a fact and a character witness. Her character testimony as to the defendant also came during her cross-examination by counsel for the defendant:

> Q. Do you think you're knowledgeable of his reputation in the community as far as general character reputation?
>
> A. Yes.

14

Q. Would that be good or bad?

A. Be good.

Q. What about his general reputation for truth or veracity for telling the truth, would that be good or bad?

A. It would be good.

Q. You would believe him under oath?

A. Yes, I would.

The remainder of her testimony on behalf of the defendant was as a fact witness. She was not cross-examined by the State about her assertions as to the defendant's good character.

Mark Davis testified that he lived in the apartment above the Tolivers' apartment and also attended the same church as the Tolivers. He said that the defendant had a "good" reputation. Davis further testified that the victim came to his apartment, "scratched up and somewhat out of breath, pretty emotional," on April 9, 1998. The victim asked to use his telephone and called the police. He said that the victim had a "gash" in his head and a "scratch on his neck [that] looked like a fingernail . . . had struck him."

Wanda Davis, the wife of Mark Davis, testified that when the victim came to their apartment, he was "very distraught, crying, sweating, and had an injury to his face, his neck." She said that she asked the victim if the defendant had "punch[ed]" him because she knew that the victim and the defendant did not get along. The victim told her that he had hit his head on the bed. Mrs. Davis said she put an ice pack on the victim's head and some ointment on his neck.

Annie Smith Toliver, testified that she married the defendant in June 1995 when the victim was 13 years old. She described the victim as "very smart," "very capable," and "very talented." She said that the victim had acted "indifferent" toward the defendant after their marriage and that the victim had never told her about his feelings toward the defendant. Mrs. Toliver said that she and the defendant had decided that the defendant would be the parent to administer discipline to her children. During the whippings, which she said occurred every four or five months, the defendant would hit the victim, "two to three times on the butt."

Mrs. Toliver testified that she had had two interactions with juvenile court regarding the victim, the first being in 1996 when the victim stole a shirt, and the second being when he ran away on April 3, 1998. Regarding the runaway incident, Mrs. Toliver said that the victim did not bring his report card home on March 27, 1998, when it was issued and that he had been skipping classes. On April 1, 1998, she went to the victim's school and obtained a copy of his report card and then grounded the victim and removed him from the school's track team of which he was a member. On

Friday, April 3, 1998, the victim did not come home from school, so she filed a missing person's report the next day with the Red Bank Police Department. The following Monday, April 6, 1998, Mrs. Toliver went to the juvenile court and filed a runaway attachment on the victim. She said that the victim was taken into custody on Tuesday, April 7, 1998, and she picked him up from the juvenile detention facility later that same evening.

Mrs. Toliver said that on the evening of April 9, 1998, the defendant went into the victim's room to discipline him. She said that she "kind of stood in the doorway," of the victim's room, and the defendant handed her a knife that he said he took from the victim. She gave the knife to Joshua and told him to put it in the kitchen. The defendant asked the victim to bend over a barrel, which she described as a "big plastic tub . . . maybe 10 or 20-gallon tub," and then hit the victim with the extension cord. The victim stood up and "came" at the defendant. The defendant handed her the extension cord and then pushed the victim back and subdued him on the floor. She said the victim "kind of calmed down and quit tussling with [the defendant]." The defendant then told the victim to get up and bend over again, and the victim complied. The defendant hit the victim again with the extension cord, and the victim "came" at the defendant again. The two began "tussling" again, and Mrs. Toliver said she screamed at them to stop fighting. Mrs. Toliver testified that the defendant then backed off and walked out of the room. The victim was breathing "kind of hard" and ran out of the room and went to the Davises' apartment.

Mrs. Toliver said that she never saw the defendant hit the victim in the face and did not see the victim hit the defendant, but the victim made a gesture toward the defendant. She testified that she did not see how the victim got hurt, but that he may have hit his head on some of the furniture in the room.

When the police arrived to arrest the defendant, Mrs. Toliver said she asked them, "Why are you taking Anderson in, why not take both of them in, they were both fighting." She also testified that when a police officer later came to her apartment to retrieve the extension cord, she told him that normally the cord had "coat hanger wire wrapped around it to hold it steady" and had "duck [sic] tape wrapped around the wire so that the wire wouldn't be exposed."

Following her testimony, Mrs. Toliver rested her case.

On behalf of Anderson Toliver, Douglas Daugherty, president of Chattanooga Resource Foundation, testified that he first met the defendant in 1993 when the defendant was selected to participate in a leadership development program through the Foundation. Daugherty testified that he felt like he knew the defendant "fairly well," that his reputation was "excellent," and he would believe him under oath in a court of law.

Melvin Benford testified that he had known the Tolivers for seven years and attended the same church as the Tolivers. He said that the defendant's reputation was "good" and that he had never seen the defendant beat the victim.

16

Aqua Peoples, a teacher at Ringgold Middle School, testified that she had known the Tolivers for seven years and also attended the same church as the Tolivers. She said that the defendant's reputation was "very good" and that she would believe him under oath in a court of law. She knew that the defendant believed in disciplining the children, but he had not told her how he went about doing so.

Tom Weathers, a teacher and football coach at Red Bank High School, testified that the victim was a member of the football team during the 1997 season. He related three infractions involving the victim at school and said that the victim was not truthful when questioned about the first incident. After the third incident, during which Weathers said that the victim had spoken to him "in a distasteful way" and Weathers told him he needed to get his attitude "straight," the victim stopped playing football. Weathers said he did not have any problems with the victim after that.

The defendant testified that, as of the time of the trial, he was 51 years old and had children from a previous marriage. He was self-employed as a photographer, the owner of a vending machine business, and the seller of health products. As the result of these occupations, he traveled a great deal, always by automobile. He met the victim's mother, his codefendant, in 1993, at a gospel record store, and they were married two years later. After their marriage, he moved into the apartment with Annie Toliver and her sons, Joshua and Gregory. Because of a change in jobs, he began traveling in 1997, apparently when he and his wife began their business. He said that, between the time of the marriage and his last contact with the victim, just after the April 9 incident, he had "whipped" the victim "about twice." A more common punishment, according to the defendant, was to "ground" the victim to his room. Although it was possible that he had whipped the victim during the six months prior to April 9, the last time that he recalled doing so was in 1996, when the victim stole a shirt from Sears. He denied that the March 1 incident had occurred. During the prior three years, he had whipped the victim's brother, Joshua, "probably twice."

As for the April 9 incident, he said that the week prior to it, he was out of town and asked his wife if the victim had brought home his report card. Learning that he had not, he discussed her going to the school to get it. He said that he arrived back in Chattanooga the morning of April 9 and, after attending to some business, arrived home at about 4:30 p.m. Both of his stepsons were home, and, after he had picked up his wife at work, they arrived back at the apartment at about 6:00 p.m.

During the week, while he was out of town, he and his wife had discussed the matter with the victim, and he had told her that she needed to report the victim missing. She had talked to the police and done as they instructed. He said that, when he and his wife discussed in the early evening what to do, he was tired and did not want to deal with the victim. After some additional discussion, he told his wife that he had "promised Gregory that if he didn't bring those grades up on the last report card, we're going to deal with that." He said that, in view of the unsatisfactory report card, as well as the fake report card the victim had given them, "I'm left with no choice, I have to carry it out. And that's exactly what I did."

17

The defendant said that he walked into the victim's room and asked him to empty his pockets, which he did not normally do. The victim then pulled a "small, straight [kitchen] knife" from his pocket, and said, "in a very angry tone," and with a frown on his face, that he was going to kill the defendant with it. The victim did not resist, however, as the defendant took the knife from his hand. The defendant then went to another room, got the braided cord, and returned to the victim's bedroom, instructing him to "bend over." The defendant struck the victim once with the cord, "moderate, nothing hard," but did not believe that the blow "stung" because the defendant "didn't really apply a lot of pressure."

The victim then stood up and grabbed the defendant by the collar, something the victim had never done before. The defendant reacted by grabbing the victim by the collar and pushing him against the bed, against the wall, and then pulling him to the floor "to subdue him." The victim complied as the defendant told him to bend over again. The defendant asked the victim's mother to hand him the braided cord, and, after she had done so, he hit the victim with it again.

The victim then stood up again and raised his fists, approaching the defendant in a "fighting stance." The defendant first asked, "Do you want to fight me, Gregory?" After his wife had called the defendant's name, however, he instructed, "Gregory, just stay in the room, we'll talk about this later." He denied putting the cord around the victim's neck, and said that his fingernails caused the "claw marks" on the victim's neck. He speculated that the injuries to the victim's face might have occurred when, during the struggle, the victim hit the dresser.

During cross-examination, when asked about previously whipping the victim, the defendant testified that he had once whipped him with a belt. He denied that he had braided the extension cord, saying that "[t]he cord was already there, it's not one I bought." He said that he had used "maybe twice" the braided cord as a whip with only one coat hanger wrapped around it, and held in place with duct tape, not three coat hangers. Both of these incidents preceded that of April 9, as did his use of a belt to whip the victim.

## ANALYSIS

### I. SUFFICIENCY OF THE EVIDENCE
### (Defendant's Issues I, II, VII, and VIII)

The defendant has presented on appeal several related issues regarding the sufficiency of the evidence: Issue I (the evidence was insufficient to sustain the convictions); Issue II (as the thirteenth juror, the trial court should have set aside the verdicts); Issue VII (the defendant's motion for judgment of acquittal should have been granted because the proof did not show that the extension cord was a "deadly weapon"); and Issue VIII (the evidence as to the March 1, 1998, incident was insufficient to establish the offense of aggravated child abuse). We will now consider these arguments.

18

In considering these issues, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). When the credibility of the witnesses was resolved by the jury in favor of the State, the appellate court "may not reconsider the jury's credibility assessments." State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000), cert. denied, ___U.S. ___, 121 S. Ct. 2600 (2001).

Utilizing these rules, we will review the allegations of the indictments and the trial evidence.

The defendant was charged in two separate indictments with aggravated child abuse. Indictment 223083 alleges, in pertinent part:

> That Anderson Toliver and Annie Smith Toliver heretofore on or about March 1, 1998, in the County aforesaid, did unlawfully and knowingly, other than by accidental means, treat Gregory Smith, a child who was sixteen years of age at the time of the offense, in such a manner as to inflict injury, and a deadly weapon was used to accomplish the act of abuse, in violation of Tennessee Code Annotated 39-15-402, against the peace and dignity of the State.

19

Indictment 223085 alleges, in pertinent part:

> That Anderson Toliver and Annie Smith Toliver heretofore on April 9, 1998, in the County aforesaid, did unlawfully and knowingly, other than by accidental means, treat Gregory Smith, a child who was sixteen years of age at the time of the offense, in such a manner as to inflict injury, and a deadly weapon was used to accomplish the act of abuse, in violation of Tennessee Code Annotated 39-15-402, against the peace and dignity of the State.

Each indictment charged the defendant with the offense of aggravated child abuse, in violation of Tennessee Code Annotated Section 39-15-402, which provides in pertinent part:

> **Aggravated child abuse and neglect.**
>
> (a)  A person commits the offense of aggravated child abuse or aggravated child neglect who commits the offense of child abuse or neglect as defined in § 39-15-401 and:
>
> > (1)  The act of abuse or neglect results in serious bodily injury to the child; or
> >
> > (2)  A deadly weapon is used to accomplish the act of abuse.
>
> (b)  A violation of this section is a Class B felony; provided, that, if the abused or neglected child is six (6) years of age or less, the penalty is a Class A felony.

Tenn. Code Ann. § 39-15-402 (Supp. 1999).

The terms "deadly weapon" and "serious bodily injury" are defined in Tennessee Code Annotated Section 39-11-106:

> (5)  "Deadly weapon" means:
>
> > (A)  A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or
> >
> > (B)  Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury[.]

. . . .

    (34)  "Serious bodily injury" means bodily injury which involves:

        (A)  A substantial risk of death;

        (B)  Protracted unconsciousness;

        (C)  Extreme physical pain;

        (D)  Protracted or obvious disfigurement; or

        (E)  Protracted loss or substantial impairment of a function
        of a bodily member, organ or mental faculty[.]

Tenn. Code Ann. § 39-11-106(5) & (34) (1997).

We will first consider whether the braided extension cord, with which the victim testified that he was whipped, qualifies as a "deadly weapon," that is, whether "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury."

The braided electrical cord was made an exhibit at the trial and is a part of the appellate record. It is a double-strand extension cord, and, as braided, approximately forty inches in length, with the original cord of sufficient length to permit it to be braided on itself what appears to be six times. It is braided in such a way that at one end are both the male and female plugs, the latter consisting of three receptacles. According to the victim, at the time of the March 1 incident, "it had coat hangers braided around it and then the extension cord and duct tape at the end." However, at the time of the April 9 incident, the braided cord no longer had coat hangers affixed around it or duct tape at the tip. As an exhibit in the appellate record, neither coat hangers nor duct tape are affixed to the cord.

Although the victim testified that he would sometimes be made to pull down his pants, leaving him wearing only his underwear, he did not say whether he had been required to pull down his trousers prior to either the March 1 or April 9 incident.

As for the manner in which the braided cord was utilized on March 1, the victim testified that he was made to bend over and then struck with the cord, fortified with coat hangers held in place with duct tape, and that if he fell, he would be hit on his back until he "had to get up." He described his feelings as "a real pain" with the first contact, and there would be "numbness, [which would] then increase." He said that at first he "couldn't feel anything and then it was just like all coming in together and it hurt real bad."

21

On April 9, according to the victim's testimony, he was first struck twice with the braided cord, and by resisting the defendant, he precipitated a struggle in which, while on the floor, he was choked by the defendant who was wearing gloves. The defendant then retrieved the cord from the victim's mother, wrapped the cord around the victim's neck, lifted him off the ground, and began "slinging" him around the room. The victim was slung into some bicycles in the room, as well as a bunk bed. He was unable to breathe and lost consciousness "for a couple of seconds." As a result of this incident, the victim said that his injuries consisted of a "real bad scar" on his eye, that his eye was "like a cherry," that his "throat was hurting real bad," that he had "scratch marks" on his neck, and that his ribs were hurting.

We will now determine whether the braided cord, as the victim testified that it was used on March 1 and April 9, was a "deadly weapon." Applying the definitions set out in Tennessee Code Annotated Section 39-11-106, the extension cord was a deadly weapon if it was "manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury" or if "in the manner of its use or intended use [it was] capable of causing death or serious bodily injury." Tenn. Code Ann. § 39-11-106(5) (1997).

Based upon the victim's testimony as to the March 1, 1998, incident, we conclude that a reasonable jury could have determined that the cord, as braided and including coat hangers held in place with duct tape, and used to strike the victim on the buttocks and the back when he fell, was an item which, "in the manner of its use or intended use [was] capable of causing death or serious bodily injury," namely "[e]xtreme physical pain." Tenn. Code Ann. §§ 39-11-106(5)(B) & (34)(C) (1997).

As to the April 9, 1998, incident, as described by the victim, we conclude, likewise, that a reasonable jury could have found the braided cord, as used both to strike the victim and then to pick him up by the neck to sling him around the room, was capable of causing "serious bodily injury" and, thus, was a "deadly weapon."

Accordingly, we conclude that the evidence was sufficient for the jury to find the defendant guilty, as to each indictment, of aggravated child abuse.

As an additional claim regarding the insufficiency of the convicting evidence, the defendant asserts that the trial court, sitting as the thirteenth juror, should have granted his motion for judgment of acquittal or, in the alternative, set aside the verdicts.

Our supreme court examined the "thirteenth juror" rule in State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). After first noting that Tennessee Rule of Criminal Procedure 33(f) made it mandatory that the trial judge act as the thirteenth juror and that "approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment," id., the court then explained the application of this responsibility:

Just as at common law, Rule 33(f) does not require the trial judge to make an explicit statement on the record. Instead, when the trial judge simply overrules a motion for new trial, an appellate court may presume that the trial judge has served as the thirteenth juror and approved the jury's verdict. Nonetheless, where the record contains statements by the trial judge expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict, or statements indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, an appellate court may reverse the trial court's judgment. Helton v. State, 547 S.W.2d at 566; Messer v. State, 385 S.W.2d at 98; State v. Burlison, 868 S.W.2d at 719; Halliburton v. State, 428 S.W.2d at 41.

Id.

Here, the trial court neither made comments "expressing dissatisfaction or disagreement with the weight of the evidence or the jury's verdict" during the trial or in its written order denying the motion for new trial. Additionally, no comments were made by the trial court indicating that it had "absolved itself of its responsibility to act as the thirteenth juror." Thus, we conclude that this assignment is without merit.

## II. CONSOLIDATION OF INDICTMENTS
### (Defendant's Issues III, IV, V, and VI)

The defendant argues that the trial court committed reversible error, both by consolidating the two indictments for trial and by allowing proof as to prior beatings of the victim by the defendant. In view of the relationship of these issues, we will review them together.

The two indictments were consolidated in the following manner. On the morning of the trial, just before the prospective jurors entered the courtroom, the State moved to dismiss two aggravated assault indictments as to each defendant, as well as the aggravated child abuse indictment against Mrs. Toliver resulting from the March 1 incident. It is unclear whether the aggravated assault indictments as to either or both defendants were based upon the same incidents as the aggravated child abuse indictments. After the trial court granted the dismissal request, there remained for trial an aggravated child abuse indictment against the defendant for the March 1 incident and an aggravated child abuse indictment against the defendant and his wife for the April 9 incident. Counsel for the defendant then asked that only the indictment alleging the April 9 incident be tried before the jury which, apparently, was waiting to enter the courtroom:

> MR. SLOAN: Judge, if I can just briefly, I guess in lieu of the state's moving to make those dismissals, I don't know if the two incidents of March 1 and April 9 as to my client would be properly joined for

23

joint trial. I would like to ask that we be able to proceed on the April 9 incident as to my client and not the March 1 incident. There are two separate offenses that are six weeks apart that involve an alleged spanking that my client gave to the stepson.

THE COURT: I assume from what Ms. Black was saying then, that the parties had agreed that these other cases would be tried together. You're moving at this time for a severance of those two cases, Mr. Sloan?

MR. SLOAN: Judge, I don't think the court really ever consolidated those two cases, March 1 and April 8 [sic] incident.

THE COURT: Is the state moving for a consolidation of those two cases?

MS. BLACK: Yes, Your Honor, the state never had an official consolidation order with the understanding between the parties and there was no objection of combining things until this point in time. We were all under the understanding that we were trying these cases together, that was the negotiations and discussions of how the plea negotiation would be offered to the defendants and at no time was it ever brought up that they would be tried separately.[7]

MR. SLOAN: Your Honor, if I may approach the podium, I'll have to say it's true. Now, I did not know, and Ms. Black may have told me, that she was going to move to dismiss all charges against Ms. Annie Toliver as allegedly took place in March. We would prefer, of course, not to be at the table when the other matter, the March matter, is tried against Mr. Toliver.

So I don't know, Ms. Black, did you mention to me about the aggravated – dismissing the – I know you did there with the assault, but the aggravated child abuse, did you mention that to me?

---

[7]Although we recognize that parties often make informal agreements as to various matters, this problem with consolidation would not have occurred had there been compliance with the pretrial motions requirements of Tennessee Rule of Criminal Procedure 12(b)(5) which, in referring to motions that "must be raised prior to trial," including motions for consolidation, has been interpreted to mean "sometime earlier than 'the day of the trial when the jury is waiting in the hall.'" Spicer v. State, 12 S.W.2d 438, 444 n.6 (Tenn. 2000) (quoting State v. Hamilton, 628 S.W.2d 742, 744 (Tenn. Crim. App. 1981)). As did the court in Spicer, we will not address the effect of the possible tardiness of the State's request because there are exceptions to this rule, because the issue was not preserved for appeal, and because the parties earlier agreed that the indictments would be consolidated, the defendant then changing his mind at the eleventh hour.

MS. BLACK: We mentioned it this morning, the state was going to dismiss the aggravated child abuse.

MR. SLOAN: I'm not saying she didn't, I mean I just –

THE COURT: Well, I understand your position. I don't think you really have, of course, a legal basis for that kind of severance, unless – I think as far as that one incident, the facts are related in the cases, the facts against one would be basically the same facts against the other one.

As to the other March incident, I don't know, I need to take up that with Mr. Sloan since he's the one actually moving for the severance of that matter. Under what basis – since these occurred on separate dates, Ms. Black, under what basis is the state asking to proceed on both of those charges against him?

MS. BLACK: Your Honor, both of them, I think, show a pattern and a common scheme of plan. The state's position will be that this was abusive behavior that was taking place over a several-year period of time. The manners were exactly the same; he would have the child bend over the exact same way in the same bedroom, would strike the child in the same manner and usually with the exact same device. And in both of these cases the allegations will be that the defendant did hit the child with the same braided extension cord over the same issues, which were great.

The only thing different in either one of the cases was about nine weeks' period of time in between when the events occurred from when the progress report came out on one child and when the actual report came out, both times he got whipped for the same thing, same house, same manner, everything.

THE COURT: Mr. Sloan, what is your response to that?

MR. SLOAN: Judge, the only thing I can say is this child, this young man involved, is 15, rather sizeable young man, and, secondly, it does involve the administering of corporal punishment; however, it's two separate incidences that are about six weeks apart.

I don't think there's anything unusual about the whipping other than the fact that if a child is whipped three or four or five different times, whether that would show any common scheme of plan to whip.

25

I don't think there's any question about that. But I don't see anything that occurred on the April incident that makes anything unusual about administering both of them. It would be very similar, I guess, in a domestic assault situation where the husband and wife maybe have an argument in March and there's an assault, and then again perhaps six weeks later have another argument that's an assault.

As I understand, and I'll let Ms. Black correct me, but as I understand, they're going to offer proof that there were two whippings, in March and April. Now, there's no question that my client and his wife did, on occasion, whip the children, but, now, to my understanding, it's not going to be any great – or any proof to show in any manner that any of this was out of the ordinary, extraordinary, except on the April occasion.

In lieu of the dismissal as to the co-defendant as to the March incident, as Your Honor knows, you can have two cases with two assaults.

The trial court then ruled that the indictments could be consolidated:

THE COURT: I think I'm ready to rule, unless there's something else different. Of course, I think what you're starting to talk about, you're sort of beginning to get into defenses and not necessarily the issue of severance.

In light of the fact – of course, you're right, Mr. Sloan. Normally, when you've got two separate charges, although the same charge, that occurred on two separate dates, the state would not be allowed and entitled to try those together. There are some exceptions; of course, one of them is a common scheme or plan, one of them is if there's a signature crime, which the marks are so much alike and it's such an unusual thing that only the defendant could have done it, going toward the identity. Of course, in this case, identity is not a problem.

However, it appears from what you're saying that intent, of course, is a problem, and in light of the fact that the intent – of course, the state is trying to show that this was a pattern of behavior which amounted to child abuse, or aggravated child abuse. I'm sure that it appears that the defense is just going to try to say that this is nothing more than mere corporal punishment and with no intent at all to commit aggravated child abuse.

26

Therefore, going to that issue of intent, since the crimes, as Ms. Black had indicated, are identical in every feature, the same place, the same room, the same method of administering this type of injury, the same weapon, or the same object I should say, or instrument, they're so identical to each other, going toward that issue of intent, I'm going to allow the state to proceed on both of these indictments. I'm going to overrule your motion, or I guess I'll sustain the state's motion to consolidate, I suppose. Is that a motion to consolidate, I guess is where we are?

MS. BLACK: Yes, Your Honor.

THE COURT: So I will sustain the state's oral motion to consolidate.

Shortly thereafter, following additional colloquy regarding pretrial matters, the prospective jurors entered the courtroom and jury selection began.

The defendant asserts the trial court erred in consolidating the indictments.

Joinder of multiple offenses against a single defendant in a single indictment or consolidation of multiple offenses against a single defendant in a single trial are governed by Rules 8, 13, and 14 of the Tennessee Rules of Criminal Procedure. Rule 8 states, in part:

**Joinder of Offenses and Defendants.**

(a) Mandatory Joinder of Offenses.--Two or more offenses shall be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses are based upon the same conduct or arise from the same criminal episode and if such offenses are known to the appropriate prosecuting official at the time of the return of the indictment(s), presentment(s), or information(s) and if they are within the jurisdiction of a single court. A defendant shall not be subject to separate trials for multiple offenses falling within this subsection unless they are severed pursuant to Rule 14.

(b) Permissive Joinder of Offenses.--Two or more offenses may be joined in the same indictment, presentment, or information, with each offense stated in a separate count, or consolidated pursuant to Rule 13 if the offenses constitute parts of a common scheme or plan or if they are of the same or similar character.

27

Rule 13 allows the trial court, at its option, to consolidate or sever offenses for trial in those instances where either the State or the defendant could have elected to consolidate or sever. See Tenn. R. Crim. P. 13, Advisory Commission Cmts. Rule 13 states:

**Consolidation or Severance.**
(a) Consolidation. The court may order consolidation of two or more indictments, presentments, or informations for trial if the offenses and all defendants could have been joined in a single indictment, presentment, or information pursuant to Rule 8.

(b) Severance. The court may order a severance of offenses or defendants before trial if a severance could be obtained on motion of a defendant or of the state pursuant to Rule 14.

Rule 14(b) states, in part:

(1) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(b), the defendant shall have a right to a severance of the offenses unless the offenses are part of a common scheme or plan and the evidence of one would be admissible upon the trial of the others.

(2) If two or more offenses have been joined or consolidated for trial pursuant to Rule 8(a), the court shall grant a severance of offenses in any of the following conditions:

(i) If before trial on motion of the state or the defendant it is deemed appropriate to promote a fair determination of the defendant's guilt or innocence of each offense.

(ii) If during trial with consent of the defendant it is deemed necessary to achieve a fair determination of the defendant's guilt or innocence of each offense. The court shall consider whether, in light of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense.

(iii) If the Court finds merit in both a motion by the district attorney general for a continuance based upon exigent circumstances that temporarily prevent the state from being ready for trial of the joined prosecutions and an objection by

28

the defendant to the continuance based on a demand for speedy trial. If the Court grants a severance under this subdivision, it shall also grant a continuance of the prosecutions wherein the exigent circumstances exist.

Our supreme court considered various aspects of consolidation of indictments in Spicer v. State, 12 S.W.3d 438 (Tenn. 2000); State v. Moore, 6 S.W.3d 235 (Tenn. 1999); and State v. Shirley, 6 S.W.3d 243 (Tenn. 1999). Moore and Shirley dealt with multi-count indictments, the defendant in each case requesting that certain counts be severed and tried separately. Spicer, which is similar to the instant case in that it involved the consolidation for a single trial of two separate indictments, alleging child rape and aggravated sexual battery, detailed the usual routes for joinder, consolidation, or severance:

> In the vast majority of permissive joinder and severance cases, the offenses sought to be joined have been consolidated by the state in the original indictment or information pursuant to Rule 8(b). In the usual case, therefore, the burden is on the defendant to move for a severance of those offenses and to satisfy the criteria of Rule 14(b)(1) before separate trials will be granted. Unless the defendant moves to sever the offenses prior to trial or at an otherwise appropriate time, the defendant waives the right to seek separate trials of multiple offenses. See Tenn. R. Crim. P. 12(b)(5); 14(a).

> Less frequently, however, the state may seek to consolidate offenses contained in multiple indictments upon motion pursuant to Rule of Criminal Procedure 13(a). When a defendant objects to the consolidation motion, the state must then demonstrate that the offenses are parts of a common scheme or plan and that evidence of each offense is admissible in the trial of the others. After an objection to consolidation has been overruled, the defendant is not then required to immediately move for a severance in order to preserve a severance issue for appeal. Because the trial court in this situation is to consider whether consolidation is proper in light of Rule 14(b)(1), a rule that requires a defendant to formally move for a severance immediately after the objection to consolidation is overruled makes little practical sense. Further, such a rule would emphasize technicality of procedure over substantive fairness, would add unjustifiable expense and delay to the proceedings, and would defeat the very purposes to be served by the Rules of Criminal Procedure.

Spicer, 12 S.W.3d at 443-44 (footnote omitted).

Spicer described the type of hearing which must be held before there can be a consolidation of offenses:

> A motion to consolidate or sever offenses is typically a pre-trial motion, see Tenn. R. Crim. P. 12(b)(5), and consequently, evidence and arguments tending to establish or negate the propriety of consolidation must be presented to the trial court in the hearing on the motion. Cf. Bruce v. State, 213 Tenn. 666, 670, 378 S.W.2d 758, 760 (1964) (stating that decisions to join offenses necessarily must be made prior to trial). Before consolidation is proper, the trial court must conclude from the evidence and arguments presented at the hearing that: (1) the multiple offenses constitute parts of a common scheme or plan, Tenn. R. Crim. P. 14(b)(1); (2) evidence of each offense is relevant to some material issue in the trial of all the other offenses, Tenn. R. Evid. 404(b)(2); Moore, 6 S.W.3d at 239; and (3) the probative value of the evidence of other offenses is not outweighed by the prejudicial effect that admission of the evidence would have on the defendant, Tenn. R. Evid. 404(b)(3). Further, because the trial court's decision of whether to consolidate offenses is determined from the evidence presented at the hearing, appellate courts should usually only look to that evidence, along with the trial court's findings of fact and conclusions of law, to determine whether the trial court abused its discretion by improperly joining the offenses.

12 S.W.3d at 445 (footnote omitted).

Although Spicer is clear in explaining the procedure that a trial court is to follow in ruling on a motion to consolidate or sever indictments, it is difficult to test the unique circumstances of this case by that procedure. According to the statements of the prosecutor and counsel for the defendant,[8] they had orally agreed prior to the trial date that the two aggravated child abuse and two aggravated assault indictments would be consolidated and tried in the same proceeding. However, on the morning of the trial, with the prospective jurors apparently waiting to come into the courtroom, the State recommended that the two aggravated assault indictments against the defendant be dismissed, whereupon defense counsel then objected to the two remaining aggravated child abuse indictments being tried together.[9]

---

[8]Counsel for Annie Toliver, whose client was named in only the April 9 indictment after the dismissal of the other indictments, did not participate in the arguments on the motion to consolidate/sever.

[9]Since neither the State nor the defendant has presented argument or authorities as to the legal effect, if any, of defendant's counsel first agreeing to the consolidation of four indictments but then objecting to the joinder of two and it does not appear to have been a factor in the trial court's analysis, we will not make it the basis for our determination.

(continued...)

Spicer instructs that an appellate court reviewing a consolidation determination usually looks to the evidence presented at the pretrial hearing, as well as the trial court's findings of fact and conclusions of law in determining whether, in joining the offenses, the trial court abused its discretion.

In the instant case, given the timing and circumstances of the consolidation hearing, it is not surprising that the hearing was somewhat truncated. In view of that fact, plus the fact that the defendant has complained about the proof presented as to prior whippings, we also will review that proof in our determination as to the merits of the improper consolidation issue.

Regarding the March 1 incident, the victim testified that school progress reports had been issued and he had made some "low grades." To avoid being whipped, the victim went to his grandmother's house, whom he had not told about the discipline. However, she called the victim's mother, and he then went home. He said that he was made to bend over in his room and was struck by the defendant, using the braided extension cord, fortified with coat hangers held in place with duct tape. He was struck on his buttocks and lower back and, as he was on the floor, his upper back.

As to the April 9 incident, the victim had again run away on Friday, April 3, 1998, because report cards were about to be issued, and gone, as he did before, to his grandmother's house. He told her that he was not "taking any more of the beatings." She told him to call his mother, which he did, telling her that he was going to stay at his grandmother's house. He was picked up by police at school on Tuesday, April 7, 1998, as a "runaway child" and taken to the juvenile detention facility, where his mother later picked him up and took him back to their apartment. She told him that he "was going to get beat [sic] anyway, regardless of what [he] did, if [he] left or whatever." The defendant arrived back at the apartment on Thursday, April 9, 1998, having been out of town. The victim was sitting in his room reading, "kind of getting ready, because [he] knew what was going to happen." The defendant entered and the incident, as previously described, then occurred.

Thus, features common to the occurrences were that they were triggered by identical extrinsic events, the victim's receiving unsatisfactory grades, which caused the defendant to administer discipline, using a braided electrical cord to strike the victim on his back and buttocks as they were in the victim's room.

Our review of the defendant's claim of improper consolidation must include the additional related proof presented at the trial.

In the trial of these matters, the victim, testifying as the State's first witness, was asked near the beginning of his testimony about whippings occurring before those alleged in the indictments. After the victim had testified as to these prior incidents, saying that the defendant had spanked him and his brother with a weight belt "probably because of grades," trial defense counsel asked the court

---

[9](...continued)

31

"again, could we approach the bench." The bench conference was not recorded. Following it, the trial court overruled whatever objection had been made and then either *sua sponte* or at the request of counsel, the record does not reveal which, instructed as to the testimony regarding the prior bad acts. According to the defendant's brief, trial defense counsel objected as to testimony regarding prior whippings during this bench conference following the victim's testimony as to prior whippings.

The defendant asserts on appeal that the trial court erred in permitting testimony as to the prior whippings, the prejudicial effect of this testimony outweighing its probative value. However, this argument overlooks the fact that the references to the prior acts were not objected to until after the victim had testified about them.

As stated in Tennessee Law of Evidence, "[i]t should be stressed that this [Rule 404(b)] hearing is only mandatory upon request. If no request for a jury-out hearing is made, the court is not obligated to provide one, although sound judicial practices may require one in some circumstances despite the absence of a request." Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[8][c] (4th ed. 2000). Given these procedural circumstances, that the trial record does not reflect that this evidence was objected to until after the victim had completed his testimony as to the prior whippings, we conclude that the defendant waived his right to object to it, and cannot now do so on appeal through different counsel. See State v. Jones, 15 S.W.3d 880, 895 (Tenn. Crim. App. 1999) ("Under Rule 404(b), the defendant has the burden of requesting a jury out hearing."), perm. to appeal denied (Tenn. 2000); State v. Schaller, 975 S.W.2d 313, 319-20 (Tenn. Crim. App. 1997) (by agreeing or acquiescing to the admission of evidence, a party does not preserve as an issue its admissibility); see also Tenn. R. Evid. 103(a)(1); Tenn. R. App. P. 36(a).

We will next consider the defendant's claim that the trial court erred in consolidating the indictments for trial.

Although the defendant argues, on appeal, that the trial court erred in consolidating the indictments, this approach overlooks the fact that the trial defense attorney previously had agreed that the cases could be tried together but changed his position as the prospective jurors had been summoned, arguing then that consolidation was improper. Under these circumstances, we cannot measure the trial court's decision to consolidate the indictments in the same fashion as we would had the defendant's objection been timely. Thus, we conclude that the defendant waived his right to object to consolidation of the indictments by waiting to do so until the morning of the trial. See Tenn. R. Crim. P. 12.[10]

_____

[10]Much of the defense was predicated upon the fact that the defendant had punished his stepson on previous occasions, including whipping him. On the morning of the trial, prior to jury selection, defense counsel advised the court that "there's going to be no question that my client will probably testify to the fact that he did whip the child on occasion." During voir dire, the prospective jurors were questioned extensively by defense counsel as to their beliefs regarding, and experiences in, spanking children. During his direct examination, the defendant testified at length about his feelings toward the victim and the types of discipline he had utilized and why. Given all of this, and the defense's attempting to put the April 9 incident into context, it is difficult to conceive how the defense would have proceeded if

(continued...)

As to the victim's testimony regarding prior whippings, the defendant also argues on appeal that the cautionary instruction given by the trial court immediately following this testimony was insufficient to remove its prejudicial effect. Since the defendant does not point to any alleged deficiency or omission in the instructions, we presume his claim to be that the cautionary instruction, although adequate in itself, was insufficient to erase the taint from the evidence of the prior whippings. However, in view of our conclusion as to that evidence, we determine that the complaint as to cautionary instructions is without merit.

Additionally, we conclude that likewise without merit is the defendant's argument on appeal that the prosecution violated "the limited authority" of the trial court to present evidence of prior incidents, and that the repeated references to this evidence violated the defendant's rights to due process and to a fair trial. References are not made to the record evidencing either that the trial court limited the authority of the State to use this evidence or repeated instances of the State's doing so. Accordingly, we conclude that this objection is waived. See Tenn. Ct. Crim. App. R. 10(b); Tenn. R. App. P. 27(a)(7) & (g); State v. Killebrew, 760 S.W.2d 228, 230 (Tenn. Crim. App. 1988).

A component of the defendant's claim that the consolidation of the indictments was erroneous is the argument, citing State v. Kendrick, 38 S.W.3d 566 (Tenn. 2001), that an election of offenses was created by the consolidation and/or proof as to similar whippings.

In Kendrick, although the defendant was charged with a single count of aggravated rape, the trial testimony was that he had forced the victim to perform fellatio on him and then, five to ten minutes later, had forced her to engage in vaginal intercourse. In reversing the conviction, the court "reject[ed] the State's contention that only one continuous offense was committed simply because the offenses were committed close in time and place." Id. at 569 (footnote omitted).

As supplemental authority for his argument that an election of offenses was required, the defendant relies upon the opinion of this court in State v. Kenneth Chambly, No. E2000-01719-CCA-R3-CD, 2001 WL 1028831 (Tenn. Crim. App. Sept. 7, 2001). In that case, the defendant was indicted for multiple incidents of aggravated sexual battery "in the month of January 1998," against twins, age 10, and their sister, age 8. Id. at *1. The prosecution presented proof of "[m]ultiple offenses, multiple dates, and multiple locations," id. at *3, but did not elect as to the particular offense for which it was seeking a conviction. In the instant case, by contrast, the offenses were alleged to have occurred on specified dates. As we have set out, the proof as to the occurrences on both of those dates left no question as to when, how, or where the events occurred. Accordingly, this decision does not advance the defendant's argument.

---

[10](...continued)
there had been no proof as to prior whippings, and the April 9 incident had been viewed in isolation. To do so would have been antithetical to the defense.

Our supreme court explained in State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001), the prosecution's responsibility as to the election of offenses: "This Court has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." Id. (citations omitted).

However, the election necessity applies when there is proof of multiple offenses committed during the period alleged in the indictment:

> [W]e recognized in Rickman that out of necessity indictments often charge general time frames that encompass several months. In those instances, we concluded that the State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the proof, the State must elect the facts upon which it is relying for conviction.

Id. at 631 (citation omitted).

In the instant case, both indictments alleged that the defendant committed aggravated child abuse against the victim during specific twenty-four-hour periods. The proof as to the March 1 incident, which the jury accepted, was that the defendant struck the victim multiple times with the braided electrical cord.

As to the April 9 incident, the witnesses agreed that the defendant struck the victim at least twice with the braided electrical cord, but the victim also testified that the defendant placed the cord around his neck, lifting him up with the cord as the defendant slung him around the room. The defendant's version was that the incident consisted of a struggle sandwiched between his striking the victim with the braided cord. However, even the victim's version that the cord was used both as a whip and a noose on April 9 would not require that the jury elect between these two uses, for the episode was a continuing course of discipline. As our supreme court explained in State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000):

> [T]his Court has made a distinction between multiple discrete acts that individually constitute separate substantive offenses and those offenses that punish a single, continuing course of conduct. In cases when the charged offense consists of a discrete act and proof is introduced of a series of acts, the state will be required to make an election. In cases when the nature of the charged offense is meant to punish a continuing course of conduct, however, election of offenses is not required because the offense is, by definition, a single offense.

We conclude that there were not multiple offenses committed on March 1, nor were there multiple offenses committed on April 9. Thus, there was no need for an election.

### III. INSTRUCTION AS TO SELF-DEFENSE
### (Defendant's Issue IX)

The defendant argues that the trial court erred in not instructing the jury as to the defense of self-defense, claiming that it was fairly raised by the evidence. The State responds that there was no factual basis which necessitated the instruction. We will examine this issue.

The defense of self-defense is set out in Tennessee Code Annotated Section 39-11-611(a):

> A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

Tenn. Code Ann. § 39-11-611(a) (1997).

As to the April 9 incident, the victim testified, during cross-examination by counsel for his mother, the codefendant, as to why he had not mentioned the knife in his statement to the police, that he voluntarily gave the knife to the defendant before the beating:

> Q. Is that the reason you didn't write it in there?
>
> A. That's not the reason. The reason I didn't write it in there is because it wasn't part of the incident, it is not what happened. The knife wasn't really a factor because I didn't use it or anything. He took it from me before anything ever started.
>
> Q. Okay. You said the knife was not part of the incident?
>
> A. No.
>
> Q. But it really was part of the incident since you had it in your pocket and you pulled it out of your hand, wasn't it?
>
> A. He asked me to empty my pockets and I pulled the knife out and had it in my mind.

Regarding the April 9 incident, Annie Toliver testified as to her son's having a knife:

Q. Okay. Will you tell the court and the jury what happened as far as that punishment was concerned?

A. Well, Gregory was in his room and Anderson went in his room. I was behind him, but not directly behind him. I went in the room after him and when I got into the room, I kind of stood in the doorway and Anderson handed me a knife and he said he had taken [it] from Gregory. At about that time Joshua was coming down the hallway and I asked Joshua, "Go put the knife in the kitchen."

Q. What kind of a knife are we talking about?

A. It was a kitchen knife. I didn't really pay very much attention to it as far as to remember, but it was a small knife, kitchen knife. But I had asked Joshua to take it back in the kitchen and put it up.

And then Anderson asked Gregory to bend over and there was a barrel there in the room that he bent over and put his hands on and Anderson hit him with the weight belt – I'm sorry, not the weight belt, the extension cord. And Gregory stood up and came up at him and at that time Anderson handed me the extension cord and I was holding it.

The defendant also testified regarding the victim's having a knife, presumably as to the April 9 incident, since he denied that the incident alleged on March 1 had occurred:

Q. Okay. Now, just tell us what you did as you walked into the room and then what happened after you got in there.

A. Okay. When I walked into the room, I asked Gregory to empty his pockets.

Q. First of all, did you have anything in your possession when you walked in there?

A. No, sir.

Q. Okay.

A. When I walked in there and I asked him to empty his pockets, he did, very easily. He reached his hand in his pockets and pulled out everything that was in his pockets and the thing I started noticing was the knife.

36

Q. Why did you ask him to empty his pockets?

A. It was just a thought that came into my mind.

Q. Do you normally do that?

A. No, sir.

Q. But this occasion you did?

A. Yes, sir.

Q. Okay. And so he produced a knife out of the pocket?

A. Yes, sir.

Q. And was this a – what type of knife?

A. It was like a small, straight knife.

Q. Was it a knife that you recognized, had you seen one like it before?

A. Yes, sir.

Q. Where?

A. In our kitchen.

Q. Do you think it may have been a knife that belonged in your kitchen?

A. Yes, sir, it was.

Q. And when Greg pulled it out, did he threaten you with it in any way?

A. When he pulled the knife out, I asked him what did he have this knife for. He said to me, "I'm going to kill you with it."

Q. When he said that to you, in what manner did he say it, Mr. Toliver?

37

A.   He had a frown on his face, he said it in a very angry tone.

Q.   Did you ever experience any anger like this out of Greg before?

A.   Never before.

Q.   And so what happened when he pulled it out and said that?

A.   When he said that, I just reached in his hand and just took the knife out of his hand and he didn't resist at all.

Q.   So you took the knife away from him?

A.   Yes.

Q.   And then what happened?

A.   Then I turn [sic] around and walk [sic] back into the room and I got the cord out of our closet, came back in and I asked him to bend over, and he did.

As described in this testimony, the defendant administered a whipping after the victim had surrendered his knife and the defendant, apparently, had gone to another room, retrieved the braided extension cord from a closet, returned to the victim's room, and instructed the victim to "bend over." Even by the defendant's version, there simply is no evidence that the defendant took this action as an act of self-defense. Accordingly, we conclude that since the defense of self-defense was not fairly raised, an instruction as to self-defense was not required. State v. Bult, 989 S.W.2d 730, 732-33 (Tenn. Crim. App. 1998).

## IV.  CHARACTER EVIDENCE INSTRUCTION
### (Defendant's Issue X)

The defendant argues that, even though he did not request an instruction as to character evidence, the trial court erred in not giving such an instruction *sua sponte*.

The defendant had the right to have a "correct and complete charge of the law given to the jury by the trial judge." State v. Stephenson, 878 S.W.2d 530, 555 (Tenn. 1994) (citing State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990)). In determining whether this obligation was met, the charge must be "'viewed in its entirety'" or "'considered as a whole.'" Stephenson, id. (quoting Otis v. Cambridge Mutual Fire Ins. Co., 850 S.W.2d 439, 446 (Tenn. 1992). Thus, we note that, although instructions as to good character proof were not given, the trial court did give a slightly modified version of T.P.I.-Crim. 42.04(a) as to the credibility of witnesses, instructing as to the eight enumerated bases for evaluating credibility.

38

In arguing that reversible error was committed when the trial court did not instruct as to character proof, the defendant cites Rader v. State, 404 S.W.2d 487 (Tenn. 1966). However, the facts in that case were far different from those of the instant case. Rader had been charged with raping his fourteen-year-old niece on two occasions, with the only persons present at the times of the two alleged attacks being the victim, the defendant, and his two young children, whose ages or abilities to testify were not set out in the opinion. The defendant denied that the rapes had occurred, and there was "little, if any, other material evidence." Id. at 488. Given these situations, the court concluded that reversible error occurred when the trial court did not instruct as to the testimony of the character witnesses presented by the defendant.

In the instant case, the proof was quite different. The defendant testified that he had, on other occasions, whipped the victim with the coat hanger fortified braided cord. He denied that he did so on March 1, 1998, however. He admitted that he struck the victim twice with the braided cord on April 9, but denied that he had used the cord that day to lift the victim by his neck and sling him around the room. In view of these admissions, in addition to the fact that testimony and photographs showed injuries sustained by the victim on April 9, this case simply does not present a victim versus defendant "swearing match" as did Rader.

Given this situation, in addition to the fact that no claim is made that the jury was not correctly instructed as to how to assess the credibility of the witnesses, we conclude that any error in not instructing the jury as to the defendant's character proof was harmless.

## V. JURY INSTRUCTIONS
### (Defendant's Issue XI)

The defendant alleges that the trial court erred "in giving preliminary jury instructions which were not repeated at the close of the proof . . . contrary to the requirements of Rule 30 of the Tennessee Rules of Criminal Procedure."

After the jury was sworn, and before opening statements by counsel, the trial court gave a portion of the charge to the jury, prefacing the instructions with the following statement:

> All right. You may be seated. Members of the jury, as I indicated to you yesterday when the jury was being selected, the facts and the evidence would come from the attorneys through the witnesses and the law would come from the court. Normally we instruct the jury as to the law at the conclusion of the trial; however, I feel that there are some things that would help you in your determination in this case, in your listening to the case and hearing the evidence and making a determination if you heard some of these things beforehand rather than at the end of the trial. So I'm going to give you some of the charge at this time.

Now, ultimately, when you go into the jury room, you'll have all the charge, all the law with you and you'll be able to look over that charge and read it at that time, the part that I'm giving you now and the part that I will give you at the conclusion of the trial.

At the conclusion of the trial, I'll give you the part of the law that pertains to the offenses and the elements of the offenses and any possibly lesser-included offenses. So this will only be a portion of the law and you'll be able to take it with you into the jury room with the rest of it at the conclusion of the trial.

Following these introductory remarks, the trial court then orally provided certain instructions to the panel of prospective jurors. The defendant does not argue that these instructions were inadequate, rather that it was error not to repeat the instructions at the conclusion of the proof.

Rule 30, Tennessee Rules of Criminal Procedure, which the defendant asserts was violated by the sequential giving of instructions, provides as follows:

(a) Special Requests. At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. At the same time copies of such requests shall be furnished to adversary counsel. The court shall inform counsel of its proposed action upon the requests, and any other portion of the instructions concerning which inquiries are made, prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. The court may, in its discretion, entertain requests for instructions at any time before the jury retires to consider its verdict.

(b) Objections. After the judge has instructed the jury, the parties shall be given opportunity to object, out of hearing of the jury, to the content of an instruction given or to the failure to give a requested instruction, but failure to make objection shall not prejudice the right of a party to assign the basis of the objection as error in support of a motion for a new trial.

(c) Character, Use and Disposition of Instructions. In the trial of all felonies except where pleas of guilty have been entered, every word of the judge's instructions shall be reduced to writing before being given to the jury. The written charge shall be read to the jury as it shall be taken to the jury room by the jury when it retires to consider its verdict. The jury shall have possession of the written charge

40

during its deliberations; and after the jury's deliberations have been concluded, the written charge shall be returned to the judge and filed with the record, but need not be copied into the minutes.

Rule 30 expressly provides that "the court shall instruct the jury after the arguments are completed." Thus, no discretion is given to the trial court as to when, in the trial, instructions are to be given to the jury: the jury is to be instructed after the completion of the final arguments. Thus, the defendant is correct in arguing that it was error for a portion of the jury instructions to be given only before proof had been presented. However, the claim is not that the instructions were incorrect or inadequate, just that their sequence was violative of Rule 30. Accordingly, while we agree that the instructions should have been given at the conclusion of the trial, we cannot conclude that the sequential giving of instructions affected its outcome. Further, a complete copy of the written instructions was given to the jury at the conclusion of the trial. Accordingly, the error in giving sequential instructions was harmless.

## VI. LESSER-INCLUDED OFFENSES
### (Defendant's Issues XII, XIII, and XIV)

### Failure to Instruct as to Lesser-Included Offenses

As to the instructions given by the trial court, the defendant has claimed a number of deficiencies. Both indictments charged the defendant with aggravated child abuse, a Class B felony. Tenn. Code Ann. § 39-15-402. The trial court instructed the jury as to this offense, as well as intentional or knowing aggravated assault, Tenn. Code Ann. § 39-13-102, a Class C felony, and child abuse, Tenn. Code Ann. § 39-15-401, a Class A misdemeanor. The defendant argues that the trial court should have instructed also as to attempted aggravated child abuse, a Class C felony; reckless aggravated assault, a Class D felony; attempted child abuse, a Class B misdemeanor; and assault, a Class A or Class B misdemeanor, as lesser-included offenses of the indicted offenses. We will now examine these claims.

As to the additional offenses which the defendant argues that the trial court should have instructed the jury, we will first determine whether each is a lesser-included offense of aggravated child abuse and, if so, whether the lesser offense should have been charged.

In State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), our supreme court concluded that "[a]n offense is a lesser-included offense if . . . (c) it consists of . . . (2) an attempt to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b) . . . ." Thus, and as conceded by the State, attempted aggravated child abuse is a lesser-included offense of aggravated child abuse, the indicted offense.

The trial court declined to instruct as to attempted aggravated child abuse because, by its analysis, the facts did not warrant an attempt instruction:

41

And I'm going to charge on the offense of Aggravated Child Abuse. I'll charge on the lesser offense of Child Abuse. I'm not going to charge on attempt – I'm not going to charge on Attempt to Commit Child Abuse because all the proof before this jury is that – well, it's either all or nothing.

Mr. Toliver, and, of course, Mrs. Toliver and in her testimony, said that he never intended to harm him, he never intend [sic] to hurt him, it was just merely administering corporal punishment, it was merely a whipping and unintentional. I mean Attempt requires intent to do an act. Child Abuse doesn't require attempt, it requires a knowing act, the mental culpability for Child Abuse or Aggravated Child Abuse as a knowing act. The mental culpability for Attempt is an intentional act.

I think the jury could either find that this happened or it didn't happen, I just don't think the proof would support – and I'm considering lesser-included offenses in the light of both State versus Burns and State versus Dominy, the two cases which recently were handed down by the Tennessee Supreme Court dealing with lesser-included offenses.

I find, ordinarily, an Attempt would be a lesser-included offense, but in this particular instance, I think the proof couldn't support it because there's been no intent to commit that act on – and an act which would fall short in the actual commission of the offense, so I think in this particular case the proof shows that this is either child abuse or it's Aggravated Child Abuse or it's nothing with reference to Mr. Toliver.

We will now determine whether, as the defendant asserts, the trial court erred in not instructing the jury as to attempted aggravated child abuse.

Tennessee Code Annotated Section § 39-12-101 defines criminal attempt:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

42

(2)   Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part;  or

(3)   Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (1997).

As Burns states, before instructing as to a lesser-included offense, first "the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence," and, then, "must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense."  6 S.W.3d at 469.  We will review the evidence to determine whether there was a factual basis for instructing as to attempted aggravated child abuse.  First, we note that although the defendant argues that attempt to commit aggravated child abuse should have been charged, he does not identify the factual basis for such an instruction.

As to the incident alleged to have occurred on March 1, the victim testified that he was struck multiple times with the braided extension cord fortified with the coat hangers.  The defendant denied that the incident had occurred at all.  If the act was committed as the victim testified, it was a completed offense and was aggravated child abuse, if the jury determined that the braided extension cord, fortified with coat hangers, constituted a "deadly weapon."  However, if the jury determined that the braided cord, as fortified with the coat hangers, did not constitute a deadly weapon, the defendant committed aggravated assault, and the jury was instructed as to both intentional and knowing aggravated assault.  Thus, we conclude that the trial court did not err in not instructing as to attempted aggravated child abuse, for there simply was no factual basis that any offense committed was other than a completed offense.  See State v. Fowler, 23 S.W.3d 285, 289 (Tenn. 2000) (concluding that when "evidence revealed two scenarios: criminal responsibility . . . or an acquittal," an instruction as to facilitation to commit a felony was not appropriate).

As to the incident alleged to have occurred on April 9, the victim testified that he was struck with the braided extension cord on his buttocks and his back, that he was choked with the defendant's hands, and that the defendant then wrapped the cord around his neck, picked him up using the cord, and slung him around the room.  The defendant said that he hit the victim once with the extension cord, and that the victim then raised up and grabbed his collar.  He pushed the victim against the bed and then pulled him onto the floor.  The defendant struck the victim once more with the cord.  After the victim stood up, raised his fists and approached, the defendant, according to his testimony, left the room.  The defendant denied placing the cord around the victim's neck and slinging him around or choking the victim.

43

Thus, as to the April 9 incident, there simply was no evidence of a "substantial step" towards the commission of aggravated child abuse. See State v. Fowler, 3 S.W.3d 910, 912 (Tenn. 1999). As with the earlier incident, there was no factual basis to find that any offense was other than a completed offense. Accordingly, an instruction was not required for attempted aggravated child abuse.

The trial court instructed as to intentional or knowing aggravated assault, and the defendant argues that the jury should have been instructed also as to reckless aggravated assault. In State v. Honeycutt, 54 S.W.3d 762 (Tenn. 2001), an opinion which was released subsequent to the trial in the instant case, our supreme court determined that knowing or reckless aggravated assault are lesser-included offenses of aggravated child abuse under part (a) of the Burns test. Accordingly, the defendant is correct in asserting that reckless aggravated assault is a lesser-included offense of aggravated child abuse.

Additionally, the defendant argues that the trial court should have instructed the jury as to misdemeanor assault, which is defined as follows:

> (a) A person commits assault who:
>
> (1) Intentionally, knowingly or recklessly causes bodily injury to another;
>
> (2) Intentionally or knowingly causes another to reasonably fear imminent bodily injury; or
>
> (3) Intentionally or knowingly causes physical contact with another and a reasonable person would regard the contact as extremely offensive or provocative.
>
> (b) Assault is a Class A misdemeanor unless the offense is committed under subdivision (a)(3), in which event assault is a Class B misdemeanor.

Tenn. Code Ann. § 39-13-101 (1997).

This offense is within the definition of "knowing" or "reckless" aggravated assault, both of which were determined in Honeycutt to be lesser-included offenses of aggravated child abuse. Accordingly, we conclude that misdemeanor assault, as well, is a lesser-included offense of the indicted offense.

We will next determine whether the trial court erred, as argued by the defendant, in not instructing as to reckless aggravated assault, a Class D felony, and assault, a Class A or Class B misdemeanor.

44

Aggravated assault is defined as follows:

(a) A person commits aggravated assault who:

(1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:

(A) Causes serious bodily injury to another; or

(B) Uses or displays a deadly weapon; or

(2) Recklessly commits an assault as defined in § 39-13-101(a)(1), and:

(A) Causes serious bodily injury to another; or

(B) Uses or displays a deadly weapon.

Tenn. Code Ann. § 39-13-102(a) (Supp. 1999).

"Reckless" is defined as follows:

(31) "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]

Tenn. Code Ann. § 39-11-106(a)(31) (1997).

In State v. Ely, 48 S.W.3d 710, 726 (Tenn. 2001), our supreme court concluded "that an erroneous failure to instruct on lesser-included offenses is a constitutional error for which the State bears the burden of proving its harmlessness beyond a reasonable doubt." The court then explained how this constitutional standard had been applied in State v. Williams, 977 S.W.2d 101 (Tenn. 1998):

The jury in Williams was instructed not only on the charged offense of premeditated first degree murder, but also on the lesser-included offenses of second degree murder and reckless homicide. The error in failing to charge voluntary manslaughter was deemed harmless

45

beyond a reasonable doubt because by rejecting the lesser offense of second degree murder, the jury clearly demonstrated its disinclination to convict on any lesser offenses, including voluntary manslaughter. Williams, 977 S.W.2d at 106.

Ely, 48 S.W.3d at 727.

As to each offense, the jury in the instant case was instructed as to aggravated child abuse, the Class B felony with which the defendant was charged, as well as intentional or knowing aggravated assault, a Class C felony, and child abuse, a Class A misdemeanor. In both cases, the jury determined that the defendant committed the Class B felony of aggravated child abuse, passing up the opportunity to convict him of the lesser-included Class C felony of knowing aggravated assault. Thus, even if the defendant is correct in asserting that the trial court erred in its instructions as to lesser-included offenses, we conclude that the failure to charge the lesser-included offenses of Class D felony reckless aggravated assault and misdemeanor assault was harmless beyond a reasonable doubt because by rejecting the intermediate lesser-included offense of knowing aggravated assault, "the jury clearly demonstrated its disinclination to convict on any lesser offenses[.]" Id.

## CONCLUSION

Based upon the foregoing authorities and reasoning, the judgments of the trial court are affirmed.

_____
ALAN E. GLENN, JUDGE

46